UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY AARON #275291,

           Plaintiff,                Civil Action No. 12-14866

    v.                              District Judge John Corbett O'Meara
                                        Magistrate Judge Laurie J. Michelson
JOHN TYLUKI, *et al.*,

           Defendants.
_____/

**REPORT AND RECOMMENDATION
TO DENY DEFENDANT DYER'S MOTION FOR SUMMARY JUDGMENT [12],
DENY DEFENDANT TYLUTKI'S MOTION FOR SUMMARY JUDGMENT [18], AND
DENY PLAINTIFF'S MOTIONS FOR JUDGMENT ON THE PLEADINGS AND/OR
SUMMARY JUDGMENT [16, 21]**

      Plaintiff Jeffrey Aaron, a Michigan Department of Corrections ("MDOC") inmate proceeding *pro se*, brought this case pursuant to 42 U.S.C. § 1983 alleging that two MDOC employees, John Tylutki (misnamed in the caption) and Dean Dyer ("Defendants"), violated his First Amendment rights by retaliating for grievances he filed. All pretrial matters have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. 7.) Presently before the Court are Defendant Dyer's Motion for Summary Judgment (Dkt. 12), Defendant Tylutki's Motion for Summary Judgment (Dkt. 18), and Plaintiff's Motions for Judgment on the Pleadings and/or Summary Judgment (Dkt. 16, 21).

      For the following reasons, the Court RECOMMENDS that Defendant Dyer's Motion for Summary Judgment (Dkt. 12) be DENIED, Defendant Tylutki's Motion for Summary Judgment (Dkt. 18) be DENIED, and Plaintiff's Motions for Judgment on the Pleadings and/or Summary Judgment (Dkt. 16, 21) be DENIED.

**I. FACTS**

The following facts are taken from the verified Complaint,[1] its exhibits and supporting affidavit by Aaron, and the affidavits by Defendants attached to their motions for summary judgment. No answer has been filed in this case.

Aaron is an inmate at the Robert G. Cotton Correctional Facility in Jackson, Michigan ("JCF"). (Dkt. 1, Compl. ¶ 1.) He began working in the JCF Food Service kitchen in April 2011. (*Id.*) Defendant Tylutki was Food Service Leader at JCF at the time of the events in the Complaint. (Dkt. 18-2, Tylutki Aff. ¶ 1.) Defendant Dean Dyer was Food Service Director at JCF at the time of the events of the Complaint. (Dkt. 12-2, Dyer Aff. ¶ 1.)

Aaron alleges that he began to be "interrogated and harassed" by Tylutki within days of being hired to work at JCF. (Compl. ¶ 2.) Aaron says that Tylutki told him, "Us Civilian Workers Stick Together," "I better not hear anything negative about you from (MSI)," and "You know we drink at the same watering hole." (Compl. ¶¶ 7, 9.) In June 2011, according to Aaron, Tylutki told Aaron, "So You Wrote a Grievance on my Friends at (MSI)," and "You Better Not Try that Shit Here." (Compl. ¶ 9.) Aaron explains that he (Aaron) used to work for Michigan State Industries ("MSI") within the prison, "and now has a civil suit pending" against them. (Compl. ¶ 7.) Tylutki attests that he has no recollection of these events. (Tylutki Aff. ¶¶ 3, 5, 6.)

Aaron states that "[d]irectly after" Tylutki confronted him about writing a grievance against MSI employees, Aaron "informed Dean Dyer of the threats and comments made by [T]ylutki." (Compl. ¶ 10.) Dyer says he has no recollection of this. (Dyer Aff. ¶ 4.) Aaron says that less than

---

[1] A verified complaint (one that is signed under penalty of perjury pursuant to 28 U.S.C. § 1746), such as the Complaint in this case, carries the same weight as would an affidavit for the purposes of summary judgment. *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).

a half hour later, Tylutki approached Aaron "with obvious disgust and told him in front of other prisoners, 'You Rat', You just snitched on me." (Compl. ¶ 11.) Tylutki maintains he has no recollection of this. (Tylutki Aff. ¶ 7.) Aaron says he immediately told Dyer "of [T]ylu[]tki's statements, and, his actions and putting him in harms way by calling him a 'Rat' in front of other Prisoners," but Dyer told him to "take care of that shit in the cooler," meaning a blind spot in the kitchen, "[b]asically telling Aaron to fight [T]ylutki." (Compl. ¶ 12.) Aaron says he asked Dyer who else he could go to for help, whereupon Dyer told Aaron he could take his complaint to Fred Parker, the facility manager. (Compl. ¶ 13.) Aaron also says, however, that Dyer told him "there is no reason to talk to the facility manager Fred Parker,""leave me and Fred Parker alone," and "stop all this tattle-telling shit." (Aaron Decl., attached to Compl., ¶¶ 10-11.) Dyer denies any recollection of this conversation. (Dyer Aff. ¶ 3.)

In late July or early August, Aaron says he told Dyer that if Tylutki would not stop "this retaliation, threats and harassment," Aaron would "have no choice but to 'file a formal grievance against him'." (Compl. ¶ 15, capitalization removed.) According to Aaron, Dyer responded: "Get The Hell Out Of My Office," and "do what you feel you have to do, [I']m through with it." (Compl. ¶ 16.) Dyer says he does not recall this. (Dyer Aff. ¶ 7.)

Aaron filed a grievance against Tylutki on August 6, 2011. (Compl. Ex. B, Pg ID 19.)[2] The grievance describes an incident on August 6 in which Tylutki found hidden food near where Aaron was prepping food in the kitchen, asked Aaron about it, and accused him of "trying to cover[ ]up for somebody" when he denied knowledge. (*Id.*) In the grievance, Aaron states that Tylutki told Aaron

---

[2] Aaron provided some foundation for this document in the verified Complaint. (*See* Compl. ¶ 17.)

3

that his "days are numbered" and that he had "a limited shelf life." (*Id.*) Tylutki responded during the grievance investigation that "he did tell prisoner Aaron that he would be watching him to [e]nsure he was following all rules in not so many words." (*Id.* at Pg ID 20.) In a Step II appeal, Aaron stated that Tylutki "promised to retaliate," "told his coworkers to not let [Aaron] work," and "told his coworkers and prisoners [Aaron] had 'snitched' 'Watch out everybody, he's mic'd!' and, 'Aaron's wired!'" (*Id.* at Pg ID 21.) Aaron also stated in the appeal that he was taken to segregation although he had not committed "a non-bondable misconduct," and that he had repeatedly asked Dyer to intervene but Dyer and Tylutki "have stated that they don't care about my complaints, grievances or lawsuit." (*Id.*)

Aaron alleges that on August 9, 2011, Dyer told Aaron "to sign off the grievance if he knows what's best for him." (Compl. ¶ 18.) When Aaron refused, he says Dyer threatened him, saying "'You made your own bed', 'I hope you have clean sheets', 'you know, I can't go against my fellow employee.'" (*Id.*) Dyer recalls that he interviewed Aaron on August 9 as part of the grievance process, but does not recall the specific communications that Aaron alleges. (Dyer Aff. ¶ 9.)

According to the Complaint, Tylutki told Aaron on August 19, 2011, that Dyer was "the one saying Aaron was a snitch etc. etc., and that Aaron, should be writing a grievance on Dyer, instead of him, as Dyer gave me the blue print on how to fire Aaron's ass." (Compl. ¶ 19.) Tylutki and Dyer do not contradict this paragraph of the Complaint. (*See* Tylutki Aff.; Dyer Aff.) Aaron's declaration attached to the Complaint adds that Dyer told him: "I did tell my employee that you were a snitch, 'you did snitch when you wrote the grievance, because my employee know better than to let inmates cook different food that's not on the menu. That's why they (F/S/E) and (prisoners) are mad at you because I took all the[ir] perks away because of you, you was the one who put it in black and white."

4

(Aaron Decl., attached to Compl., ¶ 21.) Aaron says he asked Dyer to "take back and to clarify the 'snitchen' he attributed to me, because the prisoners are giving me a very hard time, . . . and now [I']m being threatened!, and my safety is at stake." (*Id.* at ¶ 23.) Dyer's response, according to Aaron, was "'to handle it on the yard' (i.e. fight about it)." (*Id.*) Dyer does not refute these allegations. (*See* Dyer Aff.)

Aaron alleges that he "has been told on many occasions that he would not be allowed to work anymore overtime ever !! for the filing of the grievances against Tylutki." (Compl. ¶ 20.) Tylutki and Dyer do not contradict this paragraph of the Complaint. (*See* Tylutki Aff.; Dyer Aff.)

On August 21, 2011, Aaron says he was called in for overtime and Tylutki questioned him, saying, "I told them I did not want to see your ass working anymore overtime." (Compl. ¶¶ 20-21.) Tylutki says he does not recall this. (Tylutki Aff. ¶ 9.) Aaron says he told "Blood," the food service employee who had called him in for overtime, that "he felt that he need to go back to the unit because Tylutki is very mad about him working," but "Blood told Aaron, Tylutki is on some bull shit, just stay clear from him." (Compl. ¶ 22.) Then, according to Aaron, "[a]t approximately 4:55pm, when count cleared, out of nowhere, (JCF) yard officers, and unit officers converged on (JCF) kitchen, responding to an emergency call, entered the chow hall, th[e]n forcibly handcuffing Aaron, and lifted him up and carried him to segregation (the hole), stripped him naked and left him in the cell." (Compl. ¶ 24.) Tylutki and Dyer do not deny these paragraphs of the Complaint. (*See* Tylutki Aff.; Dyer Aff.) Aaron says that he was informed that he was in segregation because "Tylutki is pressing felony assault charges against him." (Compl. ¶ 25.) Tylutki responds that "[t]his statement is without merit." (Tylutki Aff. ¶ 10.)

Aaron filed a second grievance against Tylutki on August 21, 2011. (Compl. Ex. C, Pg ID

23.)[3] The grievance states that Tylutki "retaliated against [Aaron] by sending [him] to segregation." (*Id.*) It also states: "Since grieving TYLUTKI, he has spread rumors of me 'snitchin',' taking away prisoner-workers' perks by grieving, etc., and cut off my overtime, promotion, etc." (*Id.*) Aaron's grievance was denied because he failed to mention that he was "found guilty of a Class 2 Misconduct for Out of Place, written by F/S Tylutki, when [Aaron was] erroneously called in for overtime, and refused to leave." (*Id.* at Pg ID 24.) Aaron filed Step II and Step III appeals. (*Id.* at Pg ID 25.) It appears that he did not receive a response at Step II. (*Id.*) But the Step III response states: "[t]he response you received at Steps I and II reflect that your issue was in fact considered and appropriately investigated" and "[a]s there is no additional information or basis found for relief at Step III, the Step II decision is upheld at Step III." (*Id.* at Pg ID 26.)

Aaron filed a grievance against Dyer on August 22, 2011. (Compl. Ex. D, Pg ID 27.)[4] The grievance states that "prisoner-F/S workers informed [Aaron] that not only F/S Supervisor Tylutki, who I grieved, but DYER also was spreading allegations of me 'snitchin', taking away prisoner-workers' perks by grieving, etc." (*Id.*) According to the Step I Grievance Response, when Dyer was interviewed about the grievance he "did not have a negative opinion of the grievant" and "spoke positively about his job performance," but said that "his conversation with the grievant at the time of the interview was not as reported, and that he was only reiterating that theft from the chow hall by workers is not tolerated and that F/S Tylutki was only doing his job by telling him that he would

---

[3] Aaron provided some foundation for this document in the verified Complaint. (*See* Compl. ¶ 26.)

[4] Aaron provided some foundation for this document in the verified Complaint. (*See* Compl. ¶ 26.) Defendant Dyer also attached the document to his motion. (Dyer Mot. Summ. J. Ex. 2, Pg ID 115.)

be watching him closely in the future." (*Id.* at Pg ID 28.) The grievance was denied. (*Id.*) Aaron filed Step II and Step III appeals. (*Id.* at Pg ID 29.) It appears that he did not receive a response at Step II. (*Id.*) But the Step III response states: "[t]he response you received at Steps I and II reflect that your issue was in fact considered and appropriately investigated" and "[a]s there is no additional information or basis found for relief at Step III, the Step II decision is upheld at Step III." (*Id.* at Pg ID 30.)

On August 22, 2011, according to Aaron, Dyer "approached Aaron while he was eating and he slammed the grievances that he just picked up from the control center on the table in front of Aaron," and said "get out of my chow hall . . . You wrote this fucking grievance on me," and "as a matter of fact do not come back to work, I am laying you in for this pending Major misconduct ticket." (Compl. ¶¶ 30-31.) When Aaron protested that he did not have a ticket, Dyer said, according to Aaron: "the one Tylutki will write on your ass. As a matter of fact, you're being 'Terminated', I am calling classification to start the termination proceedings etc." (Compl. ¶ 32., internal quotation marks omitted.) Dyer states that he has no recollection of these communications but that he did sign a "'CSJ-363 Prisoner Program and Work Assignment Evaluation' pertaining to the termination of prisoner Aaron pending a guilty finding of a Major Misconduct Ticket." (Dyer Aff. ¶ 10-11.)

A "Prisoner Program and Work Assignment Evaluation" dated August 22, 2011, and signed by Dyer is attached to the Complaint. (Compl. Ex. E.)[5] It states that Aaron "while on CFS assignment received a Major Ticket for disobeying a direct order (DDO). If found guilty please terminate." (*Id.*, capitalization removed.)

---

[5] Aaron referenced this document in the verified Complaint, but did not provide foundation. (*See* Compl. ¶ 32.)

A "Misconduct Report" written by Tylutki on August 25, 2011, is also attached to the Complaint. (Compl. Ex. F., Pg ID 32.)[6] The report states that on August 21, 2011, Tylutki told Aaron that he was not needed for overtime and should leave the kitchen. (*Id.*) According to Tylutki's report, Aaron "looked at Blood, shrugged his shoulders, rolled his eyes, and walked to the dining room" and did not comply with Tylutki's direction. (*Id.*) Tylutki says "Aaron was then removed from food service by several officers." (*Id.*) A hearing was held on the Misconduct Report on August 30, 2011. (*Id.* at Pg ID 33.) The Hearing Report states that Aaron "denie[d] being told or hearing FSL J. Tylutki telling him to leave Cotton Food Service." (*Id.*) The Hearing Report also states that "[i]ncluded with the misconduct was a memo from FSL J. Blood," in which Blood confirmed Tylutki's account. (*Id.*) That memo is not attached to the Complaint. Tylutki's account was found to be more credible, and Aaron was found guilty of disobeying a direct order. (*Id.*) Aaron appealed, and the hearing officer's decision was affirmed. (*Id.* at Pg ID 34.)

Aaron states in his declaration attached to the Complaint that in September 2011, as he was going through the chow line, Tylutki ordered the inmate servers to leave a picked-over tray for Aaron. (Aaron Decl., attached to Compl., ¶ 47; *see also* Compl. ¶ 45.) When Aaron asked why, Tylutki said, according to Aaron: "'Rats' eat anything, take that tray and keep it moving." (*Id.*) Later, as Aaron was going through the chow line again, Tylutki ordered the inmate workers to give Aaron a regular portion rather than the double or triple portions they were giving other inmates, saying "snitches don't get double." (Aaron Decl., attached to Compl., at ¶ 48.) Tylutki does not contradict these paragraphs of Aaron's declaration. (*See* Tylutki Aff.)

---

[6] Aaron provided some foundation for this document in the verified Complaint. (*See* Compl. ¶ 39.)

Tylutki does attest in his affidavit that "[a]t no time did [he] ever retaliate against Plaintiff." (Tylutki Aff. ¶ 13.) He states: "None of my actions described in Plaintiff's complaint were done for the purpose of retaliating against Plaintiff for exercising his rights. I wrote a Disobeying a Direct Order (DDO) ticket because Plaintiff disobeyed my order for him to leave. . . . I would have written this ticket regardless of Plaintiff's protected conduct." (*Id.*) Dyer's affidavit does not include a general denial. (*See* Dyer Aff.)

## II. ANALYSIS

### A. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson*, 477 U.S.

at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

### B. Exhaustion

Defendant Dyer notes at the outset that "Plaintiff's claim against Defendant Dyer is limited to the alleged act of retaliation contained in Grievance JCF-11-08-1755-17b," the August 21, 2011 grievance Aaron filed against Dyer. (Dyer's Mot. Summ. J. at 1-2.) Dyer presumably relies on the exhaustion requirement of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), to limit Aaron's claim to his grievance. But exhaustion is an affirmative defense, *Jones v. Bock*, 549 U.S. 199, 216 (2007), and neither Dyer nor Tylutki have asserted it here. To the extent Dyer argues that certain allegations should be disregarded because of the exhaustion requirement, he cannot rely on a defense he has not asserted and briefed.

### C. First Amendment Retaliation Claim

Defendants both argue that Plaintiff failed to establish all three elements necessary for a First Amendment retaliation claim. (*See* Dyer Mot. Summ. J. at 4; Tylutki Mot. Summ. J. at 4.) Those elements are (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999). On the record before it, the Court does not find summary judgment to be warranted.

Neither Dyer nor Tylutki provide any substance to their apparent argument that Plaintiff failed to establish the first element of his retaliation claim. It is well established that filing a

grievance is protected conduct. *See e.g.*, *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) ("[P]rotected conduct includes a prisoner's 'undisputed First Amendment right to file grievances against prison officials on his own behalf.'" (quoting *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000))). Plaintiff filed two grievances against Tylutki, on August 6, 2011 (Compl. Ex. B, Pg ID 19), and August 21, 2011 (Compl. Ex. C, Pg ID 23). Plaintiff filed a grievance against Dyer on August 22, 2011. (Compl. Ex. D, Pg ID 27; Dyer Aff. Ex. 2, Pg ID 115.) Plaintiff also mentioned Dyer in his Step II appeal for the August 6 grievance. (Compl. Ex. B, Pg ID 21.)

For the second element, adverse action, Defendant Dyer argues—without citing any relevant case law—that Plaintiff's allegation that Dyer "accused Plaintiff of 'snitching' (i.e., filing grievances against Defendant Tylu[t]ki) . . . was not sufficiently adverse." (Dyer Mot. Summ. J. at 4.) Defendant Tylutki argues that "[t]he adverse action in question is Plaintiff going to administrative segregation based on the misconduct ticket," but focuses his argument on the causation element without explaining why he thinks Plaintiff has not established an adverse action. This Court finds that Plaintiff could prove adverse actions for both defendants based on Plaintiff's sworn allegations that each defendant called him a "snitch" and "rat" in front of other inmates. The evidence suggests other potentially adverse actions, including placing Plaintiff in segregation and terminating his employment, but having found one potential adverse action sufficient to survive summary judgment, the Court does not reach these other possibilities.

The Sixth Circuit has suggested that telling other prisoners that an inmate is an informant could constitute an adverse action for a retaliation claim. The court wrote in *Jackson v. Peterson*, No. 96-1144, 1996 WL 636180 (6th Cir. 1996), an unpublished case, that although a prisoner "has no inherent constitutional right or state created liberty interest to remain anonymous as an informant

11

in the prison or to remain free from being labeled a 'snitch' by prison guards, he may state a constitutional violation if he can establish that the guards revealed his identity to fellow inmates in retaliation against him for having exercised his First Amendment right of access to the courts." 1996 WL 636180 at *2. Although in *Jackson* the plaintiff failed to provide any "evidence on which a jury could reasonably find that [the defendant], either intentionally or unintentionally, referred to [the plaintiff] as an informant in any matter," *id.* at *2, several district courts in the Sixth Circuit have denied summary judgment or dismissal on facts similar to the facts before this Court.

In *Crum v. Wilkinson et al.*, No. 04-CV-249, 2006 U.S. Dist. LEXIS 735 (S.D. Ohio Jan. 11, 2006), ruling on a motion for summary judgment on a prisoner's First Amendment retaliation claim, the court held that "[l]abeling plaintiff a snitch in the presence of other inmates is certainly likely to deter a person of ordinary firmness from exercising the right at stake." 2006 U.S. Dist. LEXIS 735 at *11. In *Crum*, the plaintiff had alleged that an officer called plaintiff over on a pretext and then "began to yell loudly enough for other inmates to overhear that plaintiff was a snitch," and plaintiff "believed that [the officer] called him a snitch in order to provoke other inmates into assaulting him." *Id.* at *2-3.

In *Figel v. Suardini*, No. 03-CV-206, 2006 WL 1662999 (W.D. Mich. June 6, 2006), the court held that a genuine issue of material fact existed on the issue of adverse action where Plaintiff alleged that he was labeled a snitch in the presence of other inmates, that he was directly threatened by other prisoners because of being labeled a snitch, and that when released into the general population he would be harmed. 2006 WL 1662999 at *6.

In *Cantu v. Michigan Dept. of Corrections et al.*, No. 07-CV-10339, 2007 U.S. Dist. LEXIS 61117 (E.D. Mich. Aug. 21, 2007) (Steeh, J.), an employment action by a corrections officer, the

12

court denied a motion to dismiss by a defendant fellow corrections officer who yelled "snitches get killed in here" at plaintiff. 2007 U.S. Dist. LEXIS 61117, at *6, 27-28. The court found that this allegation could be factually developed into a "chilling" adverse action to support the plaintiff's First Amendment retaliation claim. *Id.* at *27-28.

The Second Circuit, addressing a First Amendment retaliation claim by an inmate, has required "some factual showing that the comments by the prison officials actually risked inciting other inmates." *Dawes v. Walker et al.*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also Morales v. Mackalm et al.*, 278 F.3d 126, 131 (2d Cir. 2002) (finding allegation that prison employee called plaintiff a "stoolie" in front of other inmates was not sufficiently adverse). Absent such showing, the court was "unwilling simply to assume that prison inmates would be incited, without more, to attack 'one of their own' who was labeled an 'informant' and a 'rat' for complaining to prison supervisors about a prison guard's conduct." *Dawes*, 239 F.3d at 493. The Sixth Circuit has cited *Dawes* for the more general proposition that to survive summary judgment on a First Amendment retaliation claim, "plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a de minimis injury," and "separate testimony about the likely effects of certain actions on prisoners of ordinary firmness" is not required. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002). The Sixth Circuit summarized the case as follows: "holding that prisoner's evidentiary burden under 'ordinary firmness' standard was to show that guards' references to him as an 'informant' or 'rat' 'actually risked inciting other inmates against the [plaintiff],' and was not merely harmless name-calling." *Id.*

In this case, there is sufficient evidence to create a material issue of fact as to whether

13

Tylutki and Dyer took adverse actions against Aaron that would "deter a person of ordinary firmness" from filing a grievance. Aaron stated in his verified Complaint and attached affidavit that Tylutki told him "in front of other prisoners, 'You Rat', You just snitched on me." (Compl. ¶ 11.) Aaron said in the Step II appeal for his August 6 grievance that Tylutki "told his coworkers and prisoners [Aaron] had 'snitched' 'Watch out everybody, he's mic'd!' and, 'Aaron's wired!'" (Compl. Ex. B at Pg ID 21.) Aaron also said in his declaration attached to the Complaint that Tylutki called him a "rat" and "snitch" in front of inmate servers in the chow line in September 2011. (*See* Aaron Decl., attached to Compl., ¶¶ 47-48; *see also* Compl. ¶ 45.) Tylutki has said as to the first of these allegations that he has no recollection of them. (*See* Tylutki Aff. ¶ 7.) He also has generally denied taking any retaliatory action against Tylutki. (*See* Tylutki Aff. ¶ 13.) If true, Tylutki's repeated insinuation that Aaron was a snitch—not just against corrections officers, but more generally—was more than "harmless name-calling" and is sufficient that a jury could reasonably find that Tylutki's actions could deter prisoners from pursuing grievances.

As to Dyer, Aaron's declaration attached to the Complaint alleges that Dyer admitted telling other inmates that Aaron was a snitch and was responsible for their loss of perks. (*See* Aaron Decl., attached to Compl., ¶ 21.) Aaron says that as a result, "the prisoners are giving me a very hard time, . . . and now [I']m being threatened!, and my safety is at stake." (*Id.* at ¶ 23.) Dyer has not denied nor refuted these allegations. (*See* Dyer Aff.) In addition, Aaron's August 22 grievance against Dyer says that Dyer "was spreading allegations of me 'snitchin', taking away prisoner-workers' perks by grieving, etc." (Compl. Ex. D, Pg ID 27; Dyer Aff. Ex. 2, Pg ID 115.) Whether Aaron's sworn statements can be proven or should be found credible is a matter for the trier of fact, but they sufficiently allege an adverse action to survive summary judgment.

14

Turning to the third element of Aaron's retaliation claim, Tylutki argues that Aaron cannot establish that Tylutki fabricated a misconduct ticket in retaliation because Aaron was found guilty of the misconduct ticket. (Tylutki Mot. Summ. J. at 4-5.) Tylutki does not address causation with respect to other possible adverse actions, such as the "snitch" allegations. Dyer does not specifically address the causation element at all. (*See* Tylutki Mot. Summ. J. at 3-5.)

Retaliation claims "rarely can be supported with direct evidence of intent." *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005 (quoting *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987)). Circumstantial evidence is, therefore, not only appropriate, but necessary in some cases, to analyze when determining whether a genuine issue of material fact exists. *Thaddeus-X*, 175 F.3d at 399. Temporal proximity may be circumstantial evidence of causation. The Sixth Circuit has held that where an adverse action "occurs very close in time" after protected activity, "such temporal proximity between the events is enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (finding causal connection established where plaintiff fired same day employer learned of EEOC complaint). But "where some time elapses" between the events, the Plaintiff must "couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id*. (citations omitted).

Aaron filed a grievance against Tylutki on August 6, 2011 (Compl. Ex. B, Pg ID 19). The Step II appeal for that grievance, which is dated August 25, stated that Tylutki made "snitch" comments about Aaron in front of other inmates between August 11 and August 19. (Compl. Ex. B at Pg ID 21.) Five days is sufficient temporal proximity that a finder of fact could infer causation. *See DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004) (holding twenty-one day lapse was

15

sufficient temporal proximity to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive). Moreover, there is a literal connection between the protected conduct and the adverse action alleged in this case: according to Aaron, Tylutki "spread rumors of me 'snitchin',' taking away prisoner-workers' perks by grieving." (Compl. Ex. C, Pg ID 23.) Tylutki's alleged adverse action was to alert other inmates that Aaron had engaged in protected conduct and by doing so had deprived them of their "perks." This is enough for a reasonable jury to conclude that Tylutki's adverse action was motivated at least in part by Aaron's protected conduct.

Aaron's sworn allegations are also sufficient to establish causal connection as to Dyer. Aaron alleges that on August 19, 2011, Dyer admitted telling other inmates that Aaron was a snitch and was responsible for their loss of perks. (*See* Aaron Decl., attached to Compl., ¶ 21.) This took place before Aaron filed a grievance against Dyer on August 22, 2011 (Compl. Ex. D, Pg ID 27; Dyer Aff. Ex. 2, Pg ID 115) and mentioned Dyer in a Step II grievance appeal on August 25, 2011 (Compl. Ex. B, Pg ID 21). But Dyer's action could be retaliation for Aaron's grievance against Tylutki, made on August 6, 2011. (Compl. Ex. B, Pg ID 19). This 13-day lapse between protected activity and adverse action is sufficient, especially where Dyer's statements to Aaron (according to Aaron's sworn and uncontradicted allegations) themselves make the connection:

> Dyer told me "yep" I did tell my employee that you were a snitch "you did snitch when you wrote the grievance, because my employee knew better than to let inmates cook different food that's not on the menu. That's why they (F/S/E) and (prisoners) are mad at you because I took all the[ir] perks away because of you, you was the one who put it in black and white.["]

(Aaron Decl., attached to Compl., ¶ 21.) In addition, Aaron says that Dyer told Aaron "to sign off the grievance if he knows what's best for him" and that when Aaron refused Dyer threatened him,

16

saying "'You made your own bed', 'I hope you have clean sheets', 'you know, I can't go against my fellow employee.'" (Compl. ¶ 18.) Aaron has sufficiently established a genuine issue of material fact on all three elements of his retaliation claim against both Dyer and Tylutki.

### C. Qualified Immunity

Tylutki and Dyer both argue that even if Aaron has stated a claim, they are entitled to qualified immunity. (Dyer Mot. Summ. J. at 5-7; Tylutki Mot. Summ. J. at 5-7.) "The defense of qualified immunity shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not only a defense to liability but also immunity from suit. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

This Court makes the following two-part inquiry in determining qualified immunity: (1) whether a constitutional right has been violated, and (2) whether that right was clearly established. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In determining whether a right is clearly established, the dispositive inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Thacker v. City of Columbus*, 328 F.3d 244, 260 (6th Cir. 2003) ("Qualified immunity will protect all but 'the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))). A court considers the alleged right "at a relatively high level of specificity." *Cope v. Heltsley*, 128 F.3d 452, 458 (6th Cir. 1997). In particular,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

17

> This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

As discussed above, a genuine issue of material fact exists regarding whether Plaintiff's First Amendment right was violated. This leaves the question of whether that right was clearly established. Dyer argues that Plaintiff must "come forward with case law" "that the actions described by Plaintiff were sufficiently adverse to support a retaliation claim." (Dyer Mot. Summ. J. at 6-7.) Tylutki appears to make a similar argument. (*See* Tylutki Mot. Summ. J. at 6-7.) This Court found three district court cases in the Sixth Circuit that held that actions such as Tylutki's and Dyer's could be sufficiently adverse to support a retaliation claim, as discussed above. *See Crum*, 2006 U.S. Dist. LEXIS 735 at *11; *Figel*, 2006 WL 1662999 at *6; *Cantu*, 2007 U.S. Dist. LEXIS 61117, at *27-28. That is enough to say that in the light of pre-existing law the unlawfulness of their actions was apparent. Therefore, Defendants are not entitled to qualified immunity for damages arising from Plaintiff's retaliation claim.

### D. Aaron's Motion for Summary Judgment and/or Judgment on the Pleadings

Plaintiff's responses to Dyer's and Tylutki's motions for summary judgment are both titled "Plaintiff's Response/Reply to Defendant's Motion for Summary Judgment & Qualified Immunity with Plaintiff's Motion for Summary Judgment, and or His 12(c) Motion for Judgment on the Pleadings with Brief in Support." (Dkt. 16, 21.) Plaintiff's briefs attach another affidavit (Dkt. 16 at Pg ID 175) and an MDOC policy directive about the grievance process (Dkt. 21 at Pg ID 251), but primarily rehash the allegations of the Complaint. As discussed above, there are genuine disputes of material fact that preclude summary judgment.

## III. RECOMMENDATION

For the foregoing reasons, the Court RECOMMENDS that Defendant Dyer's Motion for Summary Judgment (Dkt. 12) be DENIED, Defendant Tylutki's Motion for Summary Judgment (Dkt. 18) be DENIED, and Plaintiff's Motions for Judgment on the Pleadings and/or Summary Judgment (Dkt. 16, 21) be DENIED.

## IV. FILING OBJECTIONS TO THIS REPORT

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: July 18, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 18, 2013.

                                                s/Jane Johnson
                                                Deputy Clerk